**Cirila Baltazar CRUZ and R.J.M.B., by and through her Next Friend, Cirila Baltazar Cruz, Plaintiffs**

**v.**

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES, Singing River Health System d/b/a Singing River Hospital, and Jessie Bether, Vicki Hayes, Ralph (Matt) Mathews, and Abigail Medina, Individually, Defendants.**

**Civil Action No. 3:10–CV–446–HTW–FKB.**

United States District Court, S.D. Mississippi, Jackson Division.

Signed March 10, 2014.

Corrie Wynette Cockrell Jackson, MS, Daniel Werner–Phv, Kristi L. Graunke–Phv, Michelle R. Lapointe–Phv, Atlanta, GA, Morris S. Dees, Jr.-Phv, Montgomery, AL, for Plaintiffs.

Harold Edward Pizzetta, III, Office of the Attorney General, Wilson D. Minor, Mississippi Attorney General's Office, Jackson, MS, Kevin M. Melchi, Dogan and Wilkinson, PLLC, Roy C. Williams, Wilkinson, Williams, Kinard, Smith & Edwards, Pascagoula, MS, for Defendants.

## ORDER

HENRY T. WINGATE, District Judge.

Before the court are five motions: defendant Vicki Hayes' Motion for Summary Judgment [docket no. 42]; defendant Abigail Medina's Motion for Summary Judgment [docket no. 67]; defendant Abigail Medina's Motion to Dismiss [docket no. 68]; defendant Vicki Hayes' Motion for Review of Magistrate Judge Order [docket no. 120]; and defendant Jessie Bether's Motion for Summary Judgment and/or Motion to Dismiss [docket no. 137]. Having read the briefs and heard oral arguments, this court is persuaded to deny the summary judgment and dismissal motions [docket nos. 42, 67, 68, 137] at this time and open general discovery. This court, further, denies the motion to reverse the Magistrate Judge's order [docket no. 120]. Other outstanding motions, Motion to Strike [docket no. 133] and Motion for Discovery [docket no. 145] are dismissed as moot.

## I. COMPLAINT

On August 12, 2010, plaintiffs filed their Complaint in this court [docket no. 1]. On August 21, 2012, with permission of the court, plaintiffs filed their First Amended Complaint [docket no. 95]. The First Amended Complaint alleges eight (8) counts against the defendants.

Count I asserts claims pursuant to Title 42 U.S.C. § 1983 [1] for denial of substantive

---

1. Title 42 U.S.C. § 1983 states, in its pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or us-

due process against defendants Vicki Hayes ("Hayes"), Ralph Mathews ("Mathews"), Jessie Bether ("Bether"), and Abigail Medina ("Medina"). Plaintiffs allege that these defendants acted under color of law to deny Cirila Baltazar Cruz's ("Baltazar Cruz") interest in the care, companionship, upbringing and nurture of her child, R.J.M.B.

Plaintiffs also allege that these defendants violated the plaintiffs' Fourteenth Amendment[2] substantive due process right to family integrity. Plaintiffs further allege that these defendants conspired among themselves and with Judge Sharon Sigalas ("Judge Sigalas"), Douglas L. Tynes, Jr., Wendy Tynes, and Terry Holtz ("Holtz") to deny the plaintiffs of their Fourteenth Amendment substantive due process right to family integrity.

Count II asserts claims pursuant to Title 42 U.S.C. § 1983 for denial of procedural due process against defendants Hayes, Mathews, Bether, and Medina. Plaintiffs allege that these defendants acted under color of law to deprive the plaintiffs of fair procedures in the removal of R.J.M.B. from Baltazar Cruz's custody. Plaintiffs allege that in seeking to disrupt the relationship between mother and child, these defendants submitted false information to the Mississippi Department of Human Services and the Youth Court, and defendants maliciously and recklessly initiated an un-

founded child welfare investigation. Plaintiffs further allege that defendants deliberately failed to provide adequate language interpretation to communicate with Baltazar Cruz, thus depriving her of the right to be heard and to challenge the allegations made against her.

Plaintiffs contend that these defendants willfully and maliciously conspired among themselves and with Judge Sigalas, Douglas L. Tynes, Jr., Wendy Tynes, and Holtz to deny the plaintiffs of their Fourteenth Amendment procedural due process rights when faced with the state-initiated separation.

Count III asserts claims pursuant to Title 42 U.S.C. § 1983 for conspiracy to violate R.J.M.B.'s Fourth Amendment[3] rights against Hayes, Mathews, Bether, and Medina. Plaintiffs contend that these defendants violated the clearly-established Fourth Amendment right to be free from unreasonable seizure when they seized the newborn R.J.M.B. without having first secured a court order. Plaintiffs contend that defendants Medina and Bether deprived R.J.M.B. of her Fourth Amendment right to be free from unreasonable seizure by reporting fabricated allegations regarding Baltazar Cruz to the Mississippi Department of Human Services ("MDHS").

Count IV asserts claims pursuant to Title 42 U.S.C. § 1983 for violation of the Fourteenth Amendment[4] right to Equal

age, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

2. U.S. CONST. amend. XIV, § 1 states, in its pertinent part:
    . . . nor shall any State deprive any person of life, liberty, or property, without due process of law. . . .

3. U.S. CONST. amend. IV states:

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4. U.S. CONST. amend. XIV, § 1 states, in its pertinent part:

Protection against defendants Hayes, Mathews, Bether, and Medina. Plaintiffs contend that these defendants discriminated against the plaintiffs on the basis of the plaintiffs' Latino, Hispanic, and indigenous racial background, as well as Baltazar Cruz's national origin and immigrant status. Plaintiffs contend that they were subjected to different treatment than similarly situated individuals based on this animus.

Count V asserts claims pursuant to Title 42 U.S.C. § 1983 for violation and conspiracy to violate Title 42 U.S.C. § 1981[5] against defendants Hayes and Mathews. Plaintiffs contend that these defendants willfully and maliciously conspired among themselves and with Judge Sigalas, Douglas L. Tynes, Jr., Wendy Tynes, and Holtz to deprive Baltazar Cruz of her right to attend, and to meaningfully participate in, the proceedings through which she was separated from R.J.M.B. Plaintiffs allege that these defendants were motivated by animus based on race or national origin, and that these defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive the plaintiffs of their rights.

Count VI asserts claims pursuant to Title 42 U.S.C. § 1985(3)[6] against defendants Hayes, Mathews, Bether, and Medina. Plaintiffs claim that these defendants collaborated with one another and with Judge Sigalas, Douglas L. Tynes, Jr., Wendy Tynes, and Holtz for the purpose of depriving the plaintiffs of their equal protection rights. Plaintiffs contend that these defendants were motivated by animus against the plaintiffs' race and national origin, and as a consequence seized R.J.M.B. in violation of the Fourth Amendment, depriving the plaintiffs of their right to a familial relationship.

Count VII asserts violations of Title 42 U.S.C. § 2000d et seq.[7] against defendants

---

... nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws.

**5.** Title 42 U.S.C. § 1981 states, in its pertinent part:

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
* * *
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

**6.** Title 42 U.S.C. § 1985(3) states:

**Depriving persons of rights or privileges**
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**7.** Title 42 U.S.C. § 2000d states:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimi-

MDHS and Singing River Hospital. Plaintiffs contend that as recipients of federal financial assistance, these defendants were bound by the requirements of Title VI of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000d *et seq.*, which states: "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Plaintiffs argue that these defendants violated Title VI by intentionally discriminating against the plaintiffs based on the plaintiffs' Latino, Hispanic, and indigenous racial background, as well as on the basis of Baltazar Cruz's national origin.

Count VIII asserts a state law claim based on malicious prosecution of Baltazar Cruz against defendants, Medina, Hayes, and Mathews. Plaintiffs contend that these defendants acted maliciously and in the absence of probable cause to commence a Youth Court proceeding against Baltazar Cruz. The proceeding terminated with a ruling in favor of Baltazar Cruz.

Plaintiffs also request relief in the form of (1) reasonable damages to compensate for emotional distress suffered as a result of the defendants' unconstitutional activities; (2) punitive damages; (3) appropriate injunctive and declaratory relief; (4) court costs and discretionary costs; (5) an award of reasonable attorneys' fees; and (5) such other relief that the court may deem appropriate.

## II. JURISDICTION

This court has subject-matter jurisdiction over this lawsuit pursuant to Title 28 U.S.C. § 1331 [8], commonly referred to as federal question jurisdiction. As plaintiff's complaint alleges claims arising under the United States Constitution and federal statutes, this court has subject-matter jurisdiction to hear those claims.

This court also has subject-matter jurisdiction to rule on plaintiffs' requests for declaratory and injunctive relief pursuant to Title 28 U.S.C. 2201(a) [9], which permits a federal court to declare the rights of a party so long as there exists an "actual controversy."

Furthermore, pursuant to Title 28 U.S.C. § 1367(a) [10], this court has subject-matter jurisdiction to hear any state law claims that may be supplemental to the federal claims already alleged.

## III. BACKGROUND

This case arises out of the removal of R.J.M.B., a minor, from the custody of her

---

nation under any program or activity receiving Federal financial assistance.

**8.** Title 28 U.S.C. § 1331 states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

**9.** Title 28 U.S.C. § 2201(a) states, in its pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such dec-laration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**10.** Title 28 U.S.C. § 1367(a) states, in its pertinent part:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

mother, Baltazar Cruz. Baltazar Cruz is a Mexican immigrant who, in 2008, was living in Pascagoula, Mississippi. Baltazar Cruz is a member of the indigenous Chatino group in Oaxaca, Mexico, and speaks no English and only limited Spanish. Baltazar Cruz's primary language is Chatino, an indigenous language that is very different from Spanish. Furthermore, she has only attained the equivalent of a first-grade education and can neither read nor write in any language.

In November 2008, Baltazar Cruz was living and working in Pascagoula, Mississippi. She worked at a Chinese restaurant and lived in a three bedroom apartment leased by her employer, whose name has not been revealed. Although Baltazar Cruz had her own bedroom, she shared the apartment with a Chinese woman and her daughter, and two men.

On November 16, 2008, a pregnant Baltazar Cruz experienced labor pains. Not owning a car of her own, and being unable to find someone to take her to the hospital, Baltazar Cruz asked one of the residents in the apartment to write down the apartment address, and she began to walk to the hospital. On her way, a police officer stopped and gave her a ride to Singing River Hospital, located in Pascagoula, Mississippi, where she gave birth to a healthy girl, R.J.M.B.

At some point during the morning of November 17, 2008, a representative from Singing River Hospital social services department visited Baltazar Cruz. The representative was accompanied by Medina, a Spanish-speaking "patient advocate" who was employed by Singing River Hospital. According to Medina, when a patient presents at the hospital without prenatal records, standard protocol calls for the doctor and the doctor's partners to make a referral to the social services department. Medina, a non-medical assistant, was there to assist in helping and comforting patients. Medina is not a trained translator.

Medina and the representative attempted to communicate with Baltazar Cruz. Baltazar Cruz claims that she did not fully understand what Medina was saying, and that she tried to inform Medina of such. Knowing that Baltazar Cruz's comprehension was limited, Medina used hand gestures and orally repeated her statements multiple times.

Medina presents a variant set of facts. She insists that she easily conversed with Baltazar Cruz and had no doubt that Baltazar Cruz understood her. Later that day, Medina and the hospital representative returned to question Baltazar Cruz about her living conditions. Baltazar Cruz says she tried to explain that she worked at a Chinese restaurant and lived in employer-provided housing. When asked where she would go when she left the hospital, Baltazar Cruz says she stated that she would return to the apartment in which she had been living.

Medina informed Baltazar Cruz that she would not be permitted to leave the hospital with her daughter. At that time, no order of any kind had been entered that authorized RJMB's detention at Singing River Hospital.

On the morning of November 18, 2008, Medina and Bether, a social worker employed by Singing River Hospital, visited Baltazar Cruz, who was with her cousin, Esteban Peña Mendez ("Peña Mendez"). Peña Mendez, who speaks both Spanish and Chatino, claims that he told Medina that Baltazar Cruz did not understand Spanish well. He added that when he attempted to translate for Baltazar Cruz, Medina ordered him to "keep his mouth shut." Further, he says, Medina told him to leave the room so that she and Bether could speak to Baltazar Cruz. When Peña

Mendez offered to stay and assist in translation, Medina ordered him to stand in the hallway.

Following this conversation, Medina told Mendez that Baltazar Cruz had been trading sex for housing and intended to give up R.J.M.B. for adoption. Peña Mendez says he did not believe this statement and suggested that Medina and Baltazar Cruz had not comprehended each other. Medina, however, insisted that Baltazar Cruz had understood her completely. Peña Mendez asserts, though, that when he asked Baltazar Cruz whether she had made these statements, she vehemently denied ever having said those things.

That same morning, Medina and Bether agreed to fill out a MDHS "Report of Suspected Abuse and Neglect," formally to report child abuse and neglect against Baltazar Cruz. The report alleged that Baltazar Cruz was trading sex for housing, that she intended to give up her child, and that she was an illegal alien.

Bether contacted the Office of the Mississippi Attorney General to report that Baltazar Cruz was not a U.S. citizen. Bether also instructed another Singing River Hospital social worker to report Baltazar Cruz to federal immigration authorities.

Hayes, a case worker employed by the Jackson County, Mississippi office of MDHS, arrived at Singing River Hospital around noon on November 18, 2008. Bether, Medina, and Hayes proceeded to Baltazar Cruz's room. They reminded her that she could not leave the hospital with R.J.M.B. According to Baltazar Cruz, Peña Mendez was ordered to leave the room, even though at the time, she had looked pleadingly at her cousin urging him to stay. When he declined to leave the room, Hayes or Bether threatened to call the police.

Hayes has an alternative story. Hayes claims that it was Baltazar Cruz who asked Peña Mendez to leave the room, at which time she admitted to trading sex for housing, that she was held hostage by the Asian man who leased the apartment, that the Asian man made her move every six (6) months, and that R.J.M.B's father had abandoned her. Hayes also claims that she saw no communication difficulty between Baltazar Cruz and Medina, nor did Medina mention any difficulty.

According to Hayes, the interview lasted approximately fifteen (15) minutes, a period of time that the plaintiffs claim could not have been sufficient for Baltazar Cruz to convey her story in Spanish, in which she is not fully proficient, and have that story translated into English by Medina. Further, say plaintiffs, Hayes spoke with another Spanish-speaking hospital employee, Alicia Dred ("Dred"), who acknowledged she, Dred, had experienced communication problems when conversing with Baltazar Cruz in Spanish.

Upon contacting the Jackson County Youth Court in Pascagoula, Mississippi to obtain a custody order for R.J.M.B., Hayes was told by Marilyn Montgomery ("Montgomery"), the Youth Court designee, to visit Baltazar Cruz's residence. Baltazar Cruz admits that she was hesitant to allow MDHS agents to enter her apartment. She said she feared her employer, who leased the apartment, might not approve. Regardless, Baltazar Cruz claims that she gave Hayes the address that one of her roommates had written down.

Hayes, however, contends that Baltazar Cruz did not want Hayes to go to the house because Baltazar Cruz was concerned that the Asian man who leased the apartment might cause trouble if someone from MDHS showed up. Hayes again called Montgomery, who instructed Hayes to file a Minor's Complaint and that a

home visit was still necessary. Hayes filed the Minor's Complaint and alleged that the child was a

> Minor born to illegal immigrant with unstable home environment. Mother of newborn is said to move every six months. Currently living in apartment where she trades sex for rent money with two other families, the mother is not sure she will be able to return. The husband left the mother for another woman.

In the late afternoon of November 18, 2008, Hayes attempted to visit Baltazar Cruz's residence. The address was correct, but the apartment number was incorrect. Hayes concluded that Baltazar Cruz must have given false information regarding her residence.

That same afternoon, Baltazar Cruz was discharged from the hospital. Baltazar Cruz insists that Medina and Bether told her that if she stayed at the Salvation Army Shelter that night, she would be able to see her daughter the next morning at the Singing River Hospital. Baltazar Cruz was told that R.J.M.B. would not be discharged with her because the Youth Court of Jackson County had issued an "Order To Take Child Into Custody." R.J.M.B. was placed in the custody of Douglas L. Tynes, Jr., and Wendy Tynes (collectively "the Tynes"), a white couple, both lawyers, who desired to adopt a child. The Tynes' home was not a licensed foster home.

On the morning of November 19, 2008, Baltazar Cruz and Peña Mendez went to Singing River Hospital to seek information about R.J.M.B. They were told that R.J.M.B. was no longer at the hospital. They were given Hayes' contact information.

When Baltazar Cruz and Peña Mendez found Medina, Medina denied any knowledge about R.J.M.B.'s whereabouts, and told them to contact Hayes. Baltazar Cruz and Peña Mendez recruited the assistance of a Spanish and English speaking individual, Elizabeth Bjork ("Bjork"), who assisted them in contacting Hayes. Hayes informed them that the Jackson County Youth Court would hold a hearing that afternoon. Bjork accompanied Baltazar Cruz and Peña Mendez to the hearing, so that Bjork could translate the English to Spanish and Peña Mendez could translate the Spanish to Chatino.

At the hearing, Montgomery recommended that R.J.M.B. remain in the custody of MDHS. Bjork, on behalf of Baltazar Cruz, testified that Baltazar Cruz denied the charges leveled against her and that she had experienced difficulty understanding much of what Medina had said. Montgomery, in response acknowledged that Baltazar Cruz spoke a different "dialect" of Spanish, which may have caused some interpretation problems. Despite Baltazar Cruz's denial and Montgomery's acknowledgement that faulty interpretation may have caused doubt about the original accusations, the Youth Court Judge, Judge Sigalas, continued R.J.M.B.'s custody with MDHS.

After the hearing, Hayes, Mathews (Hayes' supervisor) and Holtz (the guardian *ad litem* assigned to R.J.M.B.) went to Baltazar Cruz's residence. Hayes described Baltazar Cruz's living conditions as follows:

> [Baltazar Cruz's] room has a mattress that is supported by plastic white paint buckets underneath. Her mattress is not completely covered, [sic] The sheets and cover are not covering one end of the mattress. On top of her television aresmall [sic] plastic toys in which [sic] [Baltazar Cruz] states that she has collected. There is no evidence of baby clothing, formula, or diapers of any kind. [Baltazar Cruz's] cousin states that he

has diapers in his truck. [Baltazar Cruz] does show worker and others a car seat that she uncovers with a bed sheet. Next to [Baltazar Cruz] is a 16–Year [sic] old Chinese girl, [J.D.] [11], who stays in the room with her mother, who works at the China Garden. [J.D.] states that she stays in her room because [Baltazar Cruz] only speaks a Spanish language and cannot communicate with her. [J.D.] then shows worker another bedroom in the front of the house where she states that two men live. She goes on to say that she does not know anything about them. [J.D.] speaks English well. Shestates [sic] that she has been studying since she was small. [J.D.] also states that her mother found the apartments through the owner of the restaurant where she works, and that they have been in this country only 4 or 5 months.

Baltazar Cruz challenges Hayes assertion that she made no preparations for the child. She admits that she had no baby formula, but says she had intended to breastfeed her child. She also admits that she had no crib, but she says she had intended to sleep with her child in the bed, as is the custom in her culture. As for diapers, says Baltazar Cruz, Peña Mendez had said he had them in his truck, but Hayes never attempted to verify his assertion. Finally, Baltazar Cruz claims that no one ever asked her whether she had purchased clothes for the child. She claims that clothes were stored in her closet. Plaintiffs also note that even though defendants now contend that they removed R.J.M.B. because of Baltazar Cruz's alleged relationship with her employer (trading sex for rent), the same allegations were made against the Chinese woman who also lived in the apartment, but her sixteen (16) year old daughter was not removed.

According to Baltazar Cruz, MDHS, after receiving Hayes report, continued to recommend that R.J.M.B. remain in MDHS custody. Furthermore, throughout the investigatory process, MDHS did not attempt to find an interpreter who could directly translate Baltazar Cruz's statements.

On December 17, 2008, Jackson County Youth Court adjudicated R.J.M.B. as "neglected." No Chatino interpreter had been provided by the court to assist Baltazar Cruz during the proceedings. The petition alleged that Baltazar Cruz resided "in an apartment which is not leased in her name, which she shares with multiple males to which [sic] she is not related," that her lack of fluency in English "placed her unborn child in danger and will place the baby in danger in the future," that she had not "purchased or obtained any supplies needed to care for said child except a car seat," and that there was no "bed, crib or alternative sleeping arrangement other than a mattress in the mother's room and their [sic] was no clothing, diapers or formula."

Baltazar Cruz, through her attorney John Foxworth, pleaded "no contest" to the neglect petition. Baltazar Cruz, however, claims that she did not understand the proceedings in which she was embroiled, including the charges against her, what her attorney was pleading on her behalf, or the consequences of this plea.

Baltazar Cruz contends that MDHS failed to give first priority in placement of R.J.M.B. to family members, like Peña Mendez, before placing her with the

---

**11.** To preserve the minor's privacy, this court will use initials to refer to the 16–year–old minor referenced in Hayes' inspection report.

Tynes, in direct contradiction of Miss.Code Ann. § 43–15–13.[12] The Youth Court Judge also denied Baltazar Cruz's request to see her daughter because she had no family members in the area and the meeting could not occur in her home or at the MDHS office. Hayes and Mathews did not volunteer any additional locations that would permit visitation.

In a hearing on January 28, 2009, Judge Sigalas and Holtz recommended that Baltazar Cruz learn English if she wished to be reunited with R.J.M.B. In addition, Wendy Tynes, the unlicensed foster mother in whose care R.J.M.B. remained, expressed her opposition to reunification between Baltazar Cruz and her daughter, claiming that returning the ten (10) week-old child to her mother would cause "developmental" problems because Baltazar Cruz could not communicate with her daughter in English. Judge Sigalas agreed, and reiterated Holtz's recommendation that Baltazar Cruz learn English as part of her "service agreement" with MDHS.

On February 25, Baltazar Cruz was finally permitted to see R.J.M.B. during a visit held in the Youth Court visitation room. Between November 18, 2008 and May 5, 2009, Baltazar Cruz only saw R.J.M.B. four (4) times, and only in the presence of the Tynes.

Baltazar Cruz contends that MDHS established "reunification" and "adoption" as the concurrent goals for R.J.M.B.'s case. Baltazar Cruz also contends that MDHS, through Hayes and Mathews, failed to develop an Individual Service Plan or conduct a Family Team Meeting in a timely manner (approximately five (5) months passed before an Individual Service Plan was issued).

Hayes disputes this characterization, stating that it was always MDHS's primary goal to reunite mother and child. Hayes further contends that any delay was the fault of Baltazar Cruz for moving three (3) times and her need for an interpreter during any meeting.

On April 24, 2009, over five (5) months after R.J.M.B. had been removed from her custody, Baltazar Cruz was presented, for the first time, with an English language "Service Agreement" document. The Service Agreement, which is a type of Individual Service Plan, is a written document between MDHS and the parent that seeks to address any identified problems and set goals and timelines for the completion of certain tasks. MDHS never sought to translate the Service Agreement or locate a Chatino interpreter to facilitate their interactions.

On May 13, 2009, Judge Sigalas ordered MDHS to prepare a package to terminate Baltazar Cruz's parental rights and ordered that any visitations cease. Further, Baltazar Cruz alleges, on information and belief, that Hayes, Mathews, Judge Sigalas, the Tynes, and Holtz engaged in multiple discussions outside her presence and without her knowledge. On June 22, 2009, MDHS submitted a termination of paren-

---

12. Miss.Code Ann. § 43–15–13 states:

When the Department of Human Services is considering placement of a child in a foster home and when the department deems it to be in the best interest of the child, the department shall give first priority to placing the child in the home of one (1) of the child's relatives within the third degree, as computed by the civil law rule. In placing the child in a relative's home, the department may waive any rule, regulation or policy applicable to placement in foster care that would otherwise require the child to have a separate bed or bedroom or have a bedroom of a certain size, if placing the child in a relative's home would be in the best interest of the child and those requirements cannot be met in the relative's home.

tal rights package to the Mississippi Attorney General's Office.

In August 2009, the United States Department of Health and Human Services (USDHHS) Office for Civil Rights and Administration for Children and Families undertook an investigation into MDHS's handling of R.J.M.B.'s case. The agency also opened an investigation into Singing River Hospital's actions in the matter.

On September 23, 2009, after commencement of the federal investigations, Judge Sigalas recused herself from the case, citing that the Tynes, "regularly practice law" before her court. The prosecutor, Michael Breland, also moved to withdraw from the case, noting that the Tynes were members of the legal community of Jackson County, Mississippi. Even Holtz, the guardian *ad litem*, withdrew, citing his acquaintance with the Tynes. During the investigation, MDHS made no attempt to return R.J.M.B. to Baltazar Cruz. A new Youth Court Judge was assigned to the case, Judge Billy G. Bridges ("Judge Bridges").

On November 19, 2009, following a Youth Court Hearing before Judge Bridges, and pursuant to an Order Granting Proposed Plan for Reunification, Baltazar Cruz regained physical custody of R.J.M.B. For the following ninety (90) day period, legal custody would remain with MDHS, and MDHS would conduct daily visits to Baltazar Cruz's residence to ensure safety compliance. At the end of the ninety (90) day period, on February 19, 2009, Baltazar Cruz was granted permanent legal custody of R.J.M.B. and MDHS was ordered to close the case.

On August 12, 2010, Baltazar Cruz filed this action in the U.S. District Court for the Southern District of Mississippi.

## IV. STANDARD OF REVIEW

### A. SUMMARY JUDGMENT

Medina, Bether, and Hayes contend that this court should grant them summary judgment on the issues raised by the plaintiffs. Understandably, this court should grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir.2007). A fact is material if "it might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether a genuine dispute exists as to any material fact, the court must consider "all of the evidence in the record but refrain from making any credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). While the court must make all reasonable inferences in favor of the non-moving party, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097 (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)).

### B. 12(b)(6) MOTION TO DISMISS STANDARD

Medina and Bether also attack Baltazar Cruz's complaint under Rule 12(b)(6) [13] of

---

**13.** Rule 12(b)(6) of the Federal Rules of Civil Procedure states:

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party

the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." When tasked with this question, this court must consider the facts in the light most favorable to the plaintiff and determines whether the complaint states a valid claim for relief. *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.,* 336 F.3d 375, 379 (5th Cir.2003).

The complaint, preaches the United States Supreme Court, must allege sufficient facts to give rise to a plausible claim. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The court "must take all of the factual allegations in the complaint as true," but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* Furthermore, a motion may be dismissed pursuant to Rule 12(b)(6) if the plaintiff has failed to comply with the applicable statute of limitations. *Moore v. El Paso, Tex.,* 660 F.2d 586, 589–90 (5th Cir.1981).

## C. WHEN BOTH A SUMMARY JUDGMENT AND A MOTION TO DISMISS ARE PRESENT

When parties submit motions that request 12(b)(6) relief or, in the alternative, summary judgment relief, the court, at its discretion, may address the entire motion as one for summary judgment. *See Americable Int'l, Inc. v. Dep't of Navy,* 129 F.3d 1271, 1273 n. 5 (D.C.Cir.1997). Furthermore, when parties have submitted and relied upon extensive documentation outside the pleadings, as the parties here present have done, the court may convert the motion to one for summary judgment. *Petrie v. City of Grapevine,* 904 F.Supp.2d 569, 575 n. 2 (N.D.Tex.2012). Therefore,

may assert the following defenses by motion:
\* \* \*

this court will address this matter under the summary judgment standard.

## D. ANALYSIS

Defendants Hayes, Bether, and Medina all claim a right to qualified immunity. In addition, Hayes claims absolute immunity for her testimony in court. This court agrees that Hayes is entitled to absolute immunity for her testimony in court, but in a case such as this, where the material facts are so hotly contested, this court cannot in good conscious grant a summary judgment motion on qualified immunity. Based on the evidence before the court at this time, the defendants Medina, Hayes, and Bether are not entitled to qualified immunity, as more fully explained below.

### A. Qualified Immunity

To defeat a claim of qualified immunity, a plaintiff must show that (1) the plaintiff has alleged that the defendant has violated a clearly established constitutional or statutory right, and (2) a reasonable person would have known of that clearly established right. *Brown v. Miller,* 519 F.3d 231, 236 (5th Cir.2008). When analyzing the second prong, the court must "consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore,* 483 F.3d 404, 411 (5th Cir.2007). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* While the question of reasonableness is intensely factual, the United States Supreme Court has held that the question of reasonable-

(6) failure to state a claim upon which relief can be granted. . . .

ness is a question of law to be reached by the court, not a jury. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

Plaintiffs contend that Medina, Hayes, Mathews, and Bether acted under color of law and in a conspiracy to violate plaintiffs' Fourteenth Amendment right to substantive Due Process, their Fourteenth Amendment right to procedural Due Process, their Fourteenth Amendment right to Equal .Protection, and R.J.M.B.'s Fourth Amendment rights. Plaintiffs also claim that Medina, Hayes, Mathews, and Bether violated Title 42 U.S.C. § 1981, Title 42 U.S.C. § 1985(3), and various state law claims.

Plaintiffs further contend that defendants violated their right to family integrity. The Fifth Circuit has held that the right to family integrity is well established. *Morris v. Dearborne,* 181 F.3d 657, 671 .(5th Cir.1999). The right, however, exists in a continuum, in which the right to family integrity exists, at its strongest, on one end, while the state's interest in protecting children exists, at its strongest, on the other. *Id.* It is when the two overlap that a person's right to family integrity becomes ill-defined and nebulous. *Id.*

### 1. Medina

Medina, who has filed a Motion for Summary Judgment [docket no. 67] and a Motion to Dismiss [docket no. 68], argues that she is entitled to qualified immunity. She contends that she was not the proximate or legal cause of the plaintiffs' separation because, although she wrote the Report of Suspected Abuse and Neglect, she did not send the letter. Medina further contends that she never seized R.J.M.B. in violation of the Fourth Amendment, that she cannot be prejudiced against Baltazar Cruz because they are both Latinos, and that she acted reasonably.

The United States Supreme Court and the United States Court of Appeals for the Fifth Circuit have held that non-judicial and non-prosecutorial state actors who unlawfully initiate legal proceedings against an individual may be held liable for the constitutional violations suffered as a result of those proceedings. *See Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (officer who filed a false affidavit in support of an application for a warrant may be held liable for the unlawful arrest of plaintiff undertaken pursuant to the court-issued warrant); *see also Morris,* 181 F.3d at 672–73 (teacher who reported fabricated allegations of sexual abuse of a child could be held liable for the court-ordered removal of the child). Further, the fabrication of evidence is not objectively reasonable. *Morris,* 181 F.3d at 672.

In *Morris,* a teacher began using a Facilitative Communicator ("FC") to communicate with a four (4) year old child named Hillary, who had been diagnosed with elective mutism—she was capable of speaking, but chose not to. *Id.* at 662. The FC is a device similar to a word processor in which "a 'facilitator' supports the arm of a developmentally disabled or mechanically deficient individual so as to allow that individual to type." *Id.* During the first attempt, the teacher "guided Hilary's hand to type a printout containing allegations of sexual abuse against her parents. At that time, Hilary could not read or write, and did not even know all the letters of the alphabet. While the teacher guided the child's hand, a number of sexually explicit and graphically violent phrases were typed." *Id.* at 663. The teacher then contacted the Texas Department of Protective & Regulatory Services to report suspected sexual abuse, and, based on the FC results, Hillary was removed from her parents' custody. *Id.* An examination of

the child revealed no evidence of sexual abuse, and, during a session with anatomically figures, she was unable to correctly refer to the male and female genitalia, even though the FC report suggested that she knew those words. *Id.* at 644. Further, when others attempted to use the FC technique with Hillary, they received only a garbled combination of letters. *Id.* at 663–64. It appeared that only the teacher could legibly communicate with Hillary, and only through the teacher could Hillary correctly identify specific sexual terms. *Id.* at 664. Eventually, Hillary was returned to her parents and the parents filed suit against the teacher. *Id.* In reviewing the circumstances in the context of qualified immunity, the court held that the teacher was not entitled to qualified immunity because she violated the plaintiffs' right to family integrity by fabricating sexual abuse allegations, and a reasonable teacher could not have believed that her actions were reasonable. *Id.* at 672.

■ In the case *sub judice,* Medina was faced with Peña Mendez's assertion that Baltazar Cruz had limited proficiency in Spanish, Baltazar Cruz's own assertion that she was having difficulty understanding Medina, a Spanish-speaking co-worker who admitted she had difficulties communicating with Baltazar Cruz, and various other individuals who contend that they had difficulty communicating with Baltazar Cruz in Spanish. Furthermore, since Medina made her allegations, certain facts have come to light that contradict those allegations: Baltazar Cruz lived in an apartment owned by her employer; Baltazar Cruz worked at a Chinese restaurant; neither Baltazar Cruz nor the other lady residing at the apartment were trading sex for rent; and no one was being held hostage.

Similar to the teacher in *Morris* who claimed she was the sole person who could communicate with an electively mute child, Medina is the only person on the record who contends that she had no difficulty speaking with Baltazar Cruz in Spanish. The allegations arising out of this questionable translation precipitated the removal of R.J.M.B. from Baltazar Cruz's custody and the subsequent Youth Court proceedings. According to *Morris,* the right to family integrity is clearly established, and a teacher is not free to fabricate evidence and submit that evidence to authorities. *Id.* at 671. At this point, this court is not passing judgment or making a finding of fact as to whose claim is true. This court finds that there are material questions of fact, and reading the facts in the light most favorable to the plaintiff, this court cannot to conclude that Medina's actions were reasonable. This court, thus finds, that she is not entitled to qualified immunity.

■ As to the Fourth Amendment claim, during different times on November 17, 2009, and November 18, 2009, Medina, in connection with Bether and Hayes, informed Baltazar Cruz that she could not leave the hospital with R.J.M.B. Plaintiffs contend that this was a seizure without a court order, in violation of the Fourth Amendment. The hospital records suggest that after being informed around noon on November 18, 2009, that she could not leave with R.J.M.B., Baltazar Cruz was not permitted to have contact with the child. The Youth Court did not issue a court order removing custody for several hours, so for a period of time Medina, Hayes, and/or Bether seized R.J.M.B. without any legal authority.

In her brief, Medina did not deny that R.J.M.B. had been seized within the meaning of the Fourth Amendment. Medina, instead, insists that in the arena of arrest, which is analogous to child removal, "if the facts supporting an arrest are put before

an intermediary such as a magistrate or grand jury, the intermediary's decision to issue a warrant or return an indictment breaks the causal chain and insulates the initiating party," even if that party acted inappropriately. *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir.1986); *see P.C. v. Conn. Dep't of Children & Families*, 662 F.Supp.2d 218, 233 (D.Conn.2009) ("a court order is the equivalent of a[n] [arrest] warrant").

The United States Supreme Court, however, has refused to relieve an officer of liability if the warrant is obtained based on false evidence. *Malley*, 475 U.S. at 344–45, 106 S.Ct. 1092. Therefore, Medina cannot claim that her seizure of R.J.M.B., before the Youth Court issued an order, is reasonable simply because the Youth Court found it reasonable based on her questionable translation.

■ In addition, this court is not persuaded to accept Medina's assertion that she was not prejudiced against Baltazar Cruz merely because both were "Latino." Latinos are not a monolithic group, but rather a mixture of different cultures that do not necessarily get along. *See, e.g., Curley v. St. John's Univ.*, 19 F.Supp.2d 181, 192–93 (S.D.N.Y 1998) ("Intra-group discrimination is especially plausible when group membership is not a simple binary variable, but a more continuous variable, whether because of degrees of membership, sub-groupings, of multi-group intersectionality." *Citing St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 610 n. 4, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)).

The evidence before the court is contradictory and the Department of Health and Human Services Office for Civil Rights has undertaken an investigation into concerns that Singing River Hospital and its employees had discriminated against Baltazar Cruz because of her national origin. Those results have not been produced at this time. Because this court has already determined to open discovery, plaintiffs may proceed on this issue for the time being, but Medina may re-urge a motion for summary judgment at the close of discovery.

**2. Hayes**

■ Hayes, who has filed a Motion for Summary Judgment [docket no. 42], claims that she is entitled to qualified immunity. She contends that she was not the proximate or legal cause of the plaintiffs' separation and that she had no duty or legal authority to return R.J.M.B. after the court issued its order removing custody. Hayes also asserts that the right to family integrity is so nebulous that it cannot be called a "well established" right, and that she acted reasonably at all times.

■ As stated above, the right to family integrity is a well-established right, but it can be nebulous when it intersects with the state's interest in protecting children from abuse and neglect. *Morris*, 181 F.3d at 671. While plaintiffs do complain of the denial of their right to family integrity at the hands of Hayes, their complaint is grounded in Hayes actions, which they contend violated their well-established rights.

Plaintiffs contend that Hayes seized R.J.M.B., in violation of the Fourth Amendment, around noon on November 18, 2009, when she informed Baltazar Cruz that she could not leave the hospital with her child. At that time, Hayes did not have a court order, and her authority as a social worker only gave her the power to seize a child in the event of exigent circumstances. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 429 (5th Cir.2008) ("the government may not seize a child from his or her parents absent a court order, parental consent, or

exigent circumstances."). Hayes argues that she did not intend to seize R.J.M.B. at that particular moment, rather it was simply a "heads-up" that when Baltazar Cruz was discharged, her child would not be discharged with her. Plaintiffs, however, contend that Baltazar Cruz could have left the hospital without being discharged and that the hospital could not retain the child without a court order or a medical reason. *See generally Kia P. v. McIntyre,* 235 F.3d 749 (2d Cir.2000) (a Second Circuit case permitting a hospital to withhold a newborn from her mother when there was concern about methadone being present in the child's urine).

Plaintiffs further allege that exigent circumstances did not exist for Hayes to seize R.J.M.B. without a court order. *See Gates,* 537 F.3d at 429 ("Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home."). At the time Hayes allegedly seized R.J.M.B., the child was only a few days old, hospital records revealed that Baltazar Cruz and R.J.M.B. were bonding well, and Hayes own Investigation Report on November 18, 2008, denied that Baltazar Cruz was abusing her child, failing to protect her child, or placing the child in danger of physical harm.

Plaintiffs also contend that Hayes violated their Fourteenth Amendment Due Process rights by providing false allegations to the court. As stated earlier, non-judicial and non-prosecutorial state actors who unlawfully initiate legal proceedings against an individual may be held liable for the constitutional violations suffered as a result of those proceedings. *See Malley,* 475 U.S. at 344, 106 S.Ct. 1092. Hayes insists that she acted reasonably in providing the Minor's Complaint and in requesting a custody order, which she based entirely on Medina's translation. This circumstance, too, is clouded by disputed fact. Hayes says that she never had any reason to doubt Medina's translation and that she did not perceive a language barrier between Medina and Baltazar Cruz.

In contrast, Baltazar Cruz states that she had difficulty communicating with Medina in Spanish, requiring much repetition and hand gesturing, which Hayes would have noticed. Baltazar Cruz also points to the other Singing River Hospital employee, who had told Hayes that she had experienced difficulty in communicating with Baltazar Cruz in Spanish, as well as Peña Mendez and his assertion that Baltazar Cruz was not proficient in Spanish and had denied the allegations.

Plaintiffs also contend that Hayes violated their Fourteenth Amendment Due Process rights by providing information regarding her investigation that was false or incomplete. In particular, Baltazar Cruz notes that during the visit to her home, Hayes did not ask her questions about the living arrangements or any supplies. In addition, Hayes report informed the court that Baltazar Cruz had made no preparations for the child, but Hayes did not even ask Baltazar Cruz if she had these items, nor did she check the closet where Baltazar Cruz claims the supplies were kept.

Hayes cites *Doe v. State of Louisiana,* 2 F.3d 1412 (5th Cir.1993), in which the court granted qualified immunity to social workers who manipulated and manufactured evidence against the parents of two children. In that case, however, the court, while recognizing that what the social workers did might be outside the bounds of reasonableness, there was no clearly established right to family integrity at that time. *Id.* at 1417–18; *see also id.* at 1421 (King, J., concurring) (describing the social worker's activities as a "witch hunt" and

the events as "egregious," but failing to find the violation of a clearly established right). In 1999, however, the Fifth Circuit in *Morris* announced that the right to family integrity was clearly established. *Morris*, 181 F.3d at 671. This court is satisfied that the plaintiffs have pleaded a violation of their Fourteenth Amendment Due process rights, and that the plaintiffs have alleged sufficient facts regarding reasonableness to overcome a Hayes qualified immunity claim.

### 3. Bether

Bether, who filed a Motion for Summary Judgment and/or Motion to Dismiss [docket no. 138], asserts that she is entitled to qualified immunity. She claims that she was not the proximate or legal cause of the plaintiffs' separation, that she did not seize R.J.M.B. in violation of the Fourth Amendment, that she was not prejudiced against Baltazar Cruz, and that she acted with objective reasonableness.

■ The evidence regarding Bether is spotty at best. The only factual allegations plaintiffs make against Bether are the following: Bether was aware of some kind of language barrier; Bether reported suspected abuse or neglect to MDHS; Bether described Baltazar Cruz as an illegal alien; and Bether seized R.J.M.B. without a court order when she told Baltazar Cruz that she could not leave the hospital.

Bether does not deny that she was unable to communicate directly with Baltazar Cruz, instead Bether communicated through Medina. Medina, contending that she could communicate with Baltazar Cruz, told Bether that Baltazar Cruz was trading sex for housing, was being held hostage, lived in a house with four people she did not know, her husband had abandoned her, and she intended to put the baby up for adoption or go back to Mexico. Based on

this interpretation, Bether believed that she had "reasonable cause to suspect" that R.J.M.B. was subject to neglect or abuse. *See* Miss.Code Ann. § 43–21–353(1) ("Any ... social worker ... having reasonable cause to suspect that a child is a neglected child or an abused child, shall cause an oral report to be made immediately telephone or otherwise and followed as soon thereafter as possible by a report in writing to the Department of Human Services"). Bether, with Medina, filled out a Report of Suspected Abused/Neglected Child or Vulnerable Adult. The report enumerated Medina's allegations.

Plaintiffs contend that Bether should have known Medina's translation was false, or that she should have questioned the authenticity of that translation. Plaintiffs point to the fact that Medina had to repeat her statements many times and use hand gestures. Plaintiffs also point to Medina's alleged hostility to Peña Mendez, the only other Chatino speaker available. Plaintiffs also note that Peña Mendez told Medina that she did not speak Spanish well and that her primary language was Chatino. Furthermore, during oral arguments, Bether and Medina's lawyer revealed that Bether and Medina had attempted to call a language line for assistance in translating, but Baltazar Cruz allegedly hung the phone up. This was the first time that the plaintiffs or the court learned this information.

This final piece of information, that Bether and Medina attempted to contact a language line, raises serious questions. Peña Mendez claims that he told Medina that Baltazar Cruz did not speak much Spanish, but rather spoke an indigenous language. It is unclear, however, whether Medina relayed this information to Bether. The United States Department of Health and Human Services has promulgated a guidance document with regard to persons

with limited English proficiency. Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed.Reg. 47,311 (Aug. 8, 2003). The guidance letter applies to hospitals, such as Singing River Hospital, that receive financial assistance from the USDHHS. *Id.* at 47,313. While compliance is not mandatory, and the USDHHS only seeks voluntary compliance, the guidance letter notes that

> in certain circumstances, the failure to ensure that LEP [limited English proficient] persons can effectively participate in, or benefit from, federally-assisted programs and activities may violate the prohibition under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Title VI regulations against national origin discrimination. Specifically, the failure of a recipient of Federal financial assistance from [USD]HHS to take reasonable steps to provide LEP persons with meaningful opportunity to participate in HHS-funded programs may constitute a violation of Title VI and HHS's implementing regulations.

*Id.* The document urges recipients of financial assistance to consider the nature and importance of their work when considering whether to institute a limited English proficiency policy. *Id.* at 47,315. In particular, the document recommends that timely language assistance, through the use of on-site interpreters or a language line, should be utilized when delay or absence of such assistance would result in the denial of services, benefits, or rights. *Id.* at 47,316.

Bether and Medina say they attempted to call a language line. This is all that the court knows. Did they choose to call because they were concerned about the sufficiency of Medina's translation? Did Bether harbor doubts about Medina's translation, but still proceeded to sign her name to the Report of Suspected Abused/Neglected Child or Vulnerable Adult? Questions of fact exist, and without further discovery, this court cannot hold Bether immune.

■ As to the Fourth Amendment claim, which this court has discussed at length in the section on Medina, Bether cannot claim that her seizure of R.J.M.B., before the Youth Court issued an order, is reasonable simply because the Youth Court found it reasonable based on Medina's questionable translation. Bether, Medina, and Hayes took custody of R.J.M.B. before any court order had been issued. Bether, like Medina, argues that "if the facts supporting an arrest are put before an intermediary such as a magistrate or grand jury, the intermediary's decision to issue a warrant or return an indictment breaks the causal chain and insulates the initiating party," even if that party acted inappropriately. *Smith,* 670 F.2d at 526. The United States Supreme Court, however, has refused to relieve an officer of liability if the warrant, or in this case the child removal order, is obtained based on false evidence. *Malley,* 475 U.S. at 344–45, 106 S.Ct. 1092.

■ With regard to the Equal Protection claim, this court is not convinced by Bether's assertion that it is "beyond the bounds of logic" that Bether, and African-American, could be prejudice against Baltazar Cruz, a Mexican citizen with an indigenous racial background. The evidence at this time is minimal and mostly deals with possible animus in the insertion of the term "illegal alien" in the referral to MDHS. Also, the USDHHS Office for Civil Rights undertook an investigation into concerns that Singing River Hospital and its employees discriminated against Baltazar Cruz because of her national origin.

Those results have not been produced at this time. Because this court has already determined to open discovery, plaintiffs may proceed on this issue for the time being, but Bether may re-urge a motion for summary judgment at the close of discovery.

## B. Absolute Immunity

In addition to qualified immunity, Hayes claims absolute immunity. The Fifth Circuit has announced that child protective service workers are not entitled to absolute immunity for every aspect of their investigations. *Morris*, 181 F.3d at 671. There is, however, a general rule that testimony presented at court is entitled to absolute immunity from § 1983 suits. *Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 277 (5th Cir.2001). Even if the witness perjures himself, or conspires to perjure himself, he is entitled to absolute immunity from suit under § 1983. *Id.* at 277. As such, Hayes is absolutely immune for her testimony at the Youth Court, but that immunity does not extend to any of her actions outside of the court with respect to Baltazar Cruz's case.

## C. OBJECTION TO MAGISTRATE JUDGE'S ORDER ALLOWING IM-MUNITY–RELATED DISCOVERY

On February 3, 2011, after Hayes filed her Motion for Summary Judgment [docket no. 42], Baltazar Cruz filed a Motion for Discovery Pursuant to Rule 56(d) [14] [docket no. 47] regarding Hayes. On May 3, 2011, after Medina filed her Motion for Summary Judgment [docket no. 67] and Motion to Dismiss [docket no. 68], Baltazar

Cruz filed a Motion for Discovery Pursuant to Rule 56(d) [docket no. 74]. Both Hayes and Medina opposed these motions. On August 17, 2012, the Magistrate Judge granted both of Baltazar Cruz's motions for discovery [docket no. 93]. In response, Hayes filed a Notice of Appeal [docket no. 94], in which she informed the court that she was appealing the Magistrate Judge's decision to the Fifth Circuit. On August 8, 2012, Hayes filed a Motion to Clarify [docket no. 99], requesting that the Magistrate Judge clarify his order to ensure that his decision complied with *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991 (5th Cir. 1995). *Wicks* requires that, prior to opening limited discovery, the court must find that (1) the plaintiff has alleged facts that, if true, would entitle the plaintiff to relief, (2) the court cannot rule on the immunity defense without additional discovery, and (3) the discovery order is narrowly tailored. *Id.* at 994.

The Magistrate Judge granted the motion, and on October 12, 2012, issued an order [docket no. 117] clarifying its previous order. The Magistrate Judge's order concluded that the plaintiffs had sufficiently pled facts that, if true, would overcome the qualified immunity defenses of Hayes and Medina. The Magistrate Judge gave the parties sixty (60) days to conduct discovery, but noted "[s]uch discovery shall be limited to issues bearing on qualified immunity, *i.e.*, whether the actions of Hayes and Medina were objectively reasonable in light of clearly-established constitutional law governing the right to family integrity." The order does not address

---

**14.** Rule 56(d) of the Federal Rules of Civil Procedure states:

> **When Facts Are Unavailable to the Non-movant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

> **(1)** defer considering the motion or deny it;
> **(2)** allow time to obtain affidavits or declarations or to take discovery; or
> **(3)** issue any other appropriate order.

whether discovery is necessary, merely that "Plaintiffs should be given the opportunity to conduct discovery in an attempt to adduce evidence in rebuttal to Hayes and Medina's respective materials for summary judgment and in support of their own factual allegations."

In response to the order, Hayes again filed an appeal with the Fifth Circuit challenging the Magistrate Judge's order. If a party disagrees with a Magistrate Judge's order, that party "may serve and file objections to the order within 14 days after being served with a copy.... The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a). The party must appeal to the district court, not to the Fifth Circuit. *See United States v. Renfro,* 620 F.2d 497, 500 (5th Cir.1980). Hayes, realizing her mistake, filed a timely Motion for Review of Magistrate Judge Order [docket no. 120] on October 26, 2012. The motion contended that the Magistrate Judge had exceeded his authority, had failed to decide whether the court could rule without the benefit of limited discovery, and did not narrowly tailor discovery.

The standard for reviewing a Magistrate Judge's order is "clearly erroneous or contrary to law". Title 28 U.S.C. § 636(b)(1)(A) [15]. This standard is highly deferential, and the court will not overturn the Magistrate Judge's order unless it is clear that a mistake has been committed. *See Collett v. Socialist Peoples' Libyan Arab Jamahiriya,* 448 F.Supp.2d 92, 95 (D.D.C.2006).

## 1. Magistrate Judge Did Not Exceed His Authority

As regards dispositive motions, a Magistrate Judge may not rule on that motion, but may only issue "findings and recommendations." Fed.R.Civ.P. 72(b)(1) [16]. Further, a Magistrate Judge is prohibited from hearing and determining "a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." Title 28 U.S.C. § 636(b)(1)(A).

Hayes argues that the Magistrate Judge's decision to open limited discovery was dispositive of the motion for summary judgment, and effectively disposed of the entire immunity claim. Hayes contends that the decision to open limited discovery is so inextricably linked to the merits of the immunity claim that it must be decided by the United States District Court Judge, not the Magistrate Judge. Hayes goes on to argue that until the issue of qualified

---

15. Title 28 U.S.C. § 636(b)(1)(A) states in its pertinent part: "....  A judge of the court may reconsider any pretrial matter ... where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."

16. Rule 72(b)(1) of the Federal Rules of Civil Procedure states:

*Findings and Recommendations.* A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense or a prisoner petition challenging the conditions of confinement. A record must be made of all evidentiary proceedings and may, at the magistrate judge's discretion, be made of any other proceedings. The magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact. The clerk must promptly mail a copy to each party.

immunity is resolved, there can be no discovery.

Hayes' argument is problematic. To begin with, there is no bar on Magistrate Judge's deciding to open limited discovery. *See generally Liberty Mut. Ins. Co. v. La. Dep't of Ins.*, 62 F.3d 115, 116 (5th Cir. 1995) (Magistrate Judge had decided to open limited discovery); *see generally Winstead v. Box*, 419 Fed.Appx. 468, 468 (5th Cir.2011) (Magistrate Judge stayed all discovery not related to qualified immunity). There is, however a bar on any judge opening full discovery without first resolving the threshold question of qualified immunity. *Nieto v. San Perlita Indep. Sch. Dist.*, 894 F.2d 174 (5th Cir.1990).

The decision to open full discovery was not before the Magistrate Judge. The Magistrate Judge was simply faced with the preliminary question of whether to open limited discovery regarding qualified immunity. Such a question is well within the Magistrate Judge's authority.

In order for a Magistrate Judge to open limited discovery, he or she must determine whether the court could rule on the issue without limited discovery. If the Magistrate Judge determines that the court could not rule on the issue without limited discovery, the Magistrate Judge may then issue an opinion granting limited discovery that is "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Lion Boulos v. Wilson*, 834 F.2d 504, 507–08 (5th Cir.1987).

### 2. Magistrate Judge Did Consider Whether The Court Could Rule Without Limited Discovery

This court is aware of the of the cases to which defendants cite that require a Magistrate Judge to only grant limited discovery if he or she concludes the court cannot reach a decision without such limited discovery. This court, however is not persuaded that the Magistrate Judge was in error. The Magistrate Judge, in granting the motion, concluded that additional discovery was necessary. This is the same conclusion that this court has reached. Further, in light of this court's decision to open discovery, defendants can claim no prejudice in the Magistrate Judge's previous decision to open limited discovery. This court need not address whether the order was narrowly tailored. The motion, therefor, is denied.

### D. CONCLUSION

Medina, Hayes, and Bether all claim that they are entitled to qualified immunity and that this case should be dismissed on those grounds. This court is unable to reach that conclusion. This case is riddled with contradicting stories and potential indicia of misconduct. Reading the evidence before the court in the light most favorable to the plaintiffs, the non-moving parties, this court finds that the plaintiffs' have presented a prima facie case that their rights were violated, that those rights were clearly established, and that the defendants acted unreasonably. As such, Hayes Motion for Summary Judgment [docket no. 42], Medina's Motion for Summary Judgment [docket no. 67], Medina's Motion to Dismiss [docket no. 68], and Bether's Motion for Summary Judgment and/or Motion to Dismiss [docket no. 137] are dismissed at this time and general discovery should be opened. This court, however, does grant absolute immunity to Hayes for her testimony in court, but that absolute immunity does not extend to any action she took outside of court. Further, this court denies the Motion to Review the Magistrate Judge's Order [docket no. 120] because the limited discovery order was not insufficient and defendants were not prejudiced by that order. Other outstanding motions, Motion to Strike [docket no.

133] and Motion for Discovery [docket no. 145] are dismissed as moot.